UNITED STATES of America

v.

BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.

No. Crim.A. 91–0655(JHG).

United States District Court, District of Columbia.

July 12, 1999.

Stefan D. Cassella, U.S. Department of Justice, Criminal Division, Asset Forfeiture Sec., Washington, DC, Bea Louise Witzleben, U.S. Department of Justice, Commercial Litigation Branch, Washington, DC, Matthew Steven Bode, U.S. Department of Justice, Criminal Division, Washington, DC, Kevin Gerard Matthews, U.S. Department of Justice, Fraud Section, Criminal Division, Washington, DC, Gerald Mann Stern, U.S. Department of Justice, Special Counsel Financial Inst. Fraud, Washington, DC, Robert Dalton, Michele Crawford, Lloyd Randolph, Ruth Harvey, Karen Meyer, DOJ attorneys.

## OPINION

JOYCE HENS GREEN, District Judge.

At last! For nearly eight years I have been presiding over this fascinating, complex, and sobering case arising out of the collapse of Bank of Credit and Commerce International ("BCCI"), the largest bank failure in history. The Order that accompanies this Opinion is the final chapter in the longest-running forfeiture proceeding in the history of federal racketeering law. Against the odds, through the combined efforts of the United States Department of Justice, the Trustees appointed by this Court, the BCCI Court Appointed Fiduciaries, the Board of Governors of the Federal Reserve System, and the District Attorney for New York County, more than $1.2 billion has been realized from BCCI assets in the United States. Most of that sum has been forwarded for distribution to the victims of BCCI's collapse.

The worldwide liquidation proceeding conducted by the BCCI Court Appointed Fiduciaries remains ongoing. To date, the Court Appointed Fiduciaries have distributed approximately $4 billion worldwide to innocent depositors and creditors. In two dividends, they have repaid creditors a total of 46 percent on admitted claims. Additional dividends are expected, although the amounts will depend on future recoveries. In contrast to the pessimistic projections of 1991, creditors will certainly receive more than half of their money back.

But today's Final Order of Forfeiture brings to an end the criminal case against the BCCI corporations and its attendant forfeiture proceeding. This Opinion summarizes the landmark events in this case to explain why terminating the forfeiture proceeding at this juncture is appropriate. The United States Government has located all of the BCCI-related assets in this country that it could, all disputes regarding ownership of those assets have been resolved, and, thus, the Court's task is complete.

The Final Order of Forfeiture, and related orders signed today, accomplish the following: (1) declare that the United States has clear title to all property forfeited during this proceeding; (2) authorize the United States Marshals Service to distribute all the assets they hold; (3) provide for the dissolution of the two trusts created by this Court to aid in the liquidation of forfeited assets; (4) transfer certain default judgments obtained by First American Corporation in civil litigation to the Department of Justice for collection; and (5) transfer the stock of First American Corporation to the Court Appointed Fiduciaries to wind up the corporation as they see fit.

After briefly outlining the events leading up to the seizure of BCCI almost exactly eight years ago—July 5, 1991—this Opinion describes how this case came to be filed here and how the parties entered into their unique Plea Agreement, which triggered this unprecedented forfeiture proceeding. The Opinion then describes the two trusts created to aid in the liquidation of forfeited assets, and the BCCI-related civil cases over which this Court also presided. The final section summarizes the

novel legal issues—procedural and substantive—that arose during the course of adjudicating a total of 175 claims by third parties contesting the forfeiture of certain assets. The conclusion acknowledges those individuals singled out by the parties as deserving of recognition for their respective contributions to the recoveries made in this case.[1]

## I. BACKGROUND TO THE BCCI CRIMINAL CASE

BCCI was founded in 1972. The moving force behind its establishment was Agha Hasan Abedi ("Abedi"), a Pakistani banker who envisioned BCCI becoming an international Islamic bank. Abedi's chief lieutenant was Saiyid Mohammad Swaleh Naqvi ("Naqvi"). Abedi remained at the helm of BCCI until 1988, when he suffered a heart attack. Naqvi succeeded him for two years, until the sovereigns of Abu Dhabi took formal control of the bank in 1990.

Abedi established the principal BCCI corporations in Luxembourg and the Cayman Islands. Although formally separate, the BCCI corporations were under the same management and were closely linked in their operations. At its peak, BCCI's coordinated international banking network had more than 400 branches in 69 countries. BCCI's depositors included large corporate interests as well as numerous small businesses and middle class households, particularly in England.

The extent of BCCI's presence in the United States was not generally known until after the bank had been seized. It was known that BCCI had accounts with correspondent banks in New York City and in the other major international money centers. Additionally, BCCI had been allowed to establish "depository agencies" in the United States.[2] But, it appeared that BCCI was not providing retail banking services to United States customers in this country.[3] There were, however, signs that BCCI sought to infiltrate the United States market.

### A. Financial General Bankshares Lawsuit

As early as 1978, a group of shareholders of Financial General Bankshares, Inc.—the predecessor of First American Bank in Washington, D.C.—sued BCCI, among others, claiming that it was behind a hostile takeover attempt. Judge Oliver Gasch, of this Court, preliminarily enjoined any further stock purchases by BCCI. In the course of that lawsuit, BCCI retained the services of prominent Washington counsel, Clark M. Clifford ("Clifford") and Robert A. Altman ("Altman"). Shortly after an amended complaint was filed in 1980, BCCI and all but one defendant settled the claims; BCCI subsequently entered into a consent judgment with the Securities and Exchange Commission. *See Financial General Bankshares, Inc. v. Metzger*, 523 F.Supp. 744, 747 & nn. 4–5 (D.D.C.1981), *vacated on jurisdictional grounds*, 680 F.2d 768 (D.C.Cir.1982).

---

1. The Court solicited and received commentary on the focal points of this case from those involved. This Opinion borrows liberally from those submissions.

2. Depository agencies may conduct many lending and trade finance functions, and may accept deposits from foreign governments and non-residents. But such agencies may not accept deposits from United States residents. Accordingly, their deposits are not insured by the Federal Deposit Insurance Corporation (the "FDIC"). Depository agencies in the United States are regulated primarily by state banking superintendents, and the Board of Governors of the Federal Reserve (the "Federal Reserve") reviews applications by foreign banks to open such agencies. By 1991, BCCI's depository agencies were in New York, New York and Los Angeles, California.

3. After the seizure of BCCI, the Governmen alleged that BCCI secretly and illegally owned and controlled Independence Bank, Encino, California, First American Bankshares Inc., in Washington, D.C., and the former National Bank of Georgia, and that BCCI illegally invested in CenTrust Savings Bank of Miami, Florida.

## B. Sale of First American Bank

Not long after BCCI had settled the *Financial General Bankshares* case, a new proposal was made to sell First American to Credit and Commerce American Investment, B.V. ("CCAI"), a Netherlands shell corporation wholly owned by Credit and Commerce American Holdings, N.V. ("CCAH"), a Netherlands Antilles corporation. The record shareholders of CCAH were wealthy individuals from the Persian Gulf. Although not apparent at the time, it now appears that nearly all of the money required for the purchase had been loaned to the investors by BCCI. Some of these loans were actual extensions of credit while others were false loans created to disguise BCCI's takeover of First American Bank.

In 1981, the Board of Governors of the Federal Reserve System held hearings to determine whether to approve the sale. Some of the proposed investors from the Middle East testified. *See, e.g., BCCI Holdings (Luxembourg) S.A. v. Khalil,* 56 F.Supp.2d 14, 38 (D.D.C.1999). Clifford and Altman appeared as counsel in those proceedings. Ultimately, the Federal Reserve approved the sale. Shortly thereafter, Clifford and Altman were chosen by the shareholders to be Managing Directors of the shell corporations, CCAH and CCAI, as well as directors and senior officers of the re-christened First American Corporation, the holding company that controlled the largest bank in the Washington, D.C. area. *See generally First American Corp. v. Al–Nahyan,* 17 F.Supp.2d 10, 13–14 (D.D.C.1998).

## C. BCCI's Connection to General Noriega

BCCI again came to the fore in 1987 and 1988 in connection with investigations into narcotics trafficking by Panamanian General Manuel Noriega. It was known that Noriega had a banking relationship with BCCI and First American. Federal prosecutors, and then committees of the United States Senate and House of Representatives, investigated allegations that BCCI was laundering Noriega's drug proceeds. BCCI was indicted in the United States District Court in Tampa, Florida and subsequently pled guilty to federal money laundering charges. Certain BCCI employees also were indicted, tried, and convicted on money laundering charges. *See United States v. Awan,* 966 F.2d 1415 (11th Cir.1992) (affirming convictions in large part).

## D. Seizure of BCCI

Then in 1990 and early 1991, BCCI became the focus of attention in the United States and abroad. In this country, news reports in 1990, and intensifying in early 1991, indicated that the Federal Reserve was investigating rumors that BCCI had secretly been behind the takeover of First American. In December 1990, the Republic of Panama sued BCCI and First American in the United States District Court for the Southern District of Florida, alleging that BCCI illegally owned First American and that both sets of corporate entities had violated federal racketeering laws in laundering proceeds from narcotics trafficking for the benefit of General Noriega.[4]

Abroad, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which "disclosed evidence of a complex and massive fraud at BCCI, including substantial loan and treasury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial

---

4. After lengthy proceedings, the claims against First American were dismissed for lack of jurisdiction or for failure to state a RICO claim, and the claims against BCCI were dismissed on the grounds that they should be asserted in the BCCI liquidation proceedings rather than in a lawsuit in the United States. *See generally Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935 (11th Cir.1997) (affirming dismissals).

position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI*, 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 3, 1991).

The results of the audit were shared with regulators in other countries, and, on July 5, 1991, banking regulators in the United Kingdom, Luxembourg and the United States, froze assets owned or controlled by BCCI. This included seizure of BCCI's deposit agencies by the Superintendent of Banks of the State of California (since retitled the Commissioner of Financial Institutions of the State of California) and the Superintendent of Banks of the State of New York. In addition, the New York Superintendent of Banks seized BCCI's assets at various New York banks, including those at the Bank of New York ("BNY") and Security Pacific Bank ("SPB"). By July 6th, eighteen countries had shut down BCCI's operations in their jurisdictions, and, as of July 29, 1991, forty-four countries had closed down BCCI branches. Responding to the closure of BCCI and the apparent confirmation of its illegal ownership of First American, depositors in BCCI filed putative class action lawsuits in August 1991 against BCCI's auditors, First American and approximately 70 other parties charging RICO violations.[5]

### E. Appointment of BCCI Liquidators

Upon closure, courts in Luxembourg and the Cayman Islands appointed provisional Liquidators to take control of the BCCI corporations. These Liquidators subsequently were permanently appointed,[6] and are hereafter referred to as "the Liquidators" or "Court Appointed Fiduciaries." The Court Appointed Fiduciaries were under immediate pressure to determine the extent of the fraud, the true amount of BCCI's assets, and what payment, if any, the innocent depositors and creditors would receive from the liquidation. From the information available in 1991, BCCI was hopelessly insolvent, with a "black hole" quantified by the Court Appointed Fiduciaries at approximately $10 billion. Unlike in the United States, where most bank deposits are federally insured up to $100,000, the depositors in BCCI had no such governmental safety net. It was predicted that the victims of the BCCI collapse would receive a return of between zero and ten cents on the dollar.

With such a bleak outlook, the prospects for an orderly winding up of the BCCI corporations were not great. To avoid internecine conflict, the English, Luxembourg, and Cayman Islands Liquidators agreed to pool whatever assets they could recover from their respective BCCI corporations to be distributed equitably among all of BCCI's creditors and depositors. But, in other countries with so-called "ring-fenced branches" of BCCI, local liquidators who were liquidating individual BCCI offices on a piecemeal basis with preference for local creditors, threatened to create a chaotic worldwide scramble for assets, further depleting BCCI's resources and creating inequalities among the victims.

5. *See, e.g., Hamid v. Price Waterhouse & Co.*, Civ.Act. No. 91–4483–CBM (C.D.Cal., filed Aug. 9, 1991); *see also Ali v. BankAmerica Corp., et al.*, Civ.Act. No. 92–309 (E.D.Pa., filed Jan. 16, 1992). The Ninth Circuit affirmed the dismissal of the claims in *Hamid* holding that suits against alleged perpetrators of the BCCI fraud must be brought by the Court Appointed Fiduciaries in the name of the BCCI corporations rather than derivatively by the depositors. *See Hamid v. Price Waterhouse*, 51 F.3d 1411, 1420 (9th Cir.1995).

6. A Board of Liquidators, consisting of the Liquidators appointed by the Courts in England, the Cayman Islands, and Luxembourg, coordinates global asset recovery efforts. The activities of the Board of Liquidators are conducted pursuant to various agreements, including pooling agreements, which provide for the pooling of assets of the BCCI Group and the ICIC entities to ensure that all admitted creditors of any BCCI Group or ICIC entity receive an equal pro rata dividend. *See Khalil*, 56 F.Supp.2d at 26, 23 n.5 & 68.

## F. Filing of This Case

Further complicating the task of the Court Appointed Fiduciaries was the legal jeopardy facing BCCI. From July through November 1991, BCCI's affairs were investigated by banking regulators, federal prosecutors, and prosecutors from New York County. These investigations led to administrative charges filed by the Federal Reserve seeking a $200 million civil penalty, an indictment in New York County, and this case, triggered by the November 15, 1991, filing of a three-count indictment charging BCCI with conspiracy, wire fraud and racketeering. Three individuals also were charged in the case: Abedi, Naqvi, and Ghaith R. Pharaon, a wealthy investor in BCCI and participant in many of BCCI's fraudulent schemes.

The Court Appointed Fiduciaries and the United States authorities—the Department of Justice, the Federal Reserve and the District Attorney of New York County, collectively—met in November 1991 to seek a resolution that would both vindicate law enforcement interests in punishing the wrongdoers while maximizing the return to the innocent victims of BCCI's fraud. As a product of those discussions, the United States filed a superseding criminal Information that included a forfeiture allegation under federal racketeering law. See FED.R.CRIM.P. 7(c)(2); 18 U.S.C. § 1963. The Court Appointed Fiduciaries proposed to plead guilty on behalf of the BCCI corporations to the Information, and obtained expedited approval from their appointing courts to do so.

## II. BCCI PLEA AGREEMENT

The parties presented the Plea Agreement to this Court on December 19, 1991. Under the Agreement, all BCCI assets found in the United States were to be forfeited pursuant to the RICO forfeiture provision, 18 U.S.C. § 1963.[7] That section renders forfeitable any property interest that the defendant acquires or maintains in the course of a RICO violation or that the defendant obtains with proceeds from a RICO violation. See 18 U.S.C. § 1963(a). In the Plea Agreement, the parties agreed that BCCI had been engaged in a pattern of racketeering activity from 1977 to 1991.

Congress, in § 1963, also conferred on the Attorney General the discretion to return all or part of the assets forfeited to the United States to the victims of the racketeering offense. See 18 U.S.C. § 1963(g). The Plea Agreement embodied

---

7. To be precise, not all BCCI assets in the United States were directly subjected to federal forfeiture. Accommodation with the interests of New York and California regulators was made.

Under California and New York law, a foreign bank operating a depository agency must keep the assets of its business transacted in the state separate and apart from its other assets. In the event of liquidation of the agency, creditors of the business in the state (or creditors of the *agency*, in the case of New York law) have a priority claim to those assets. In the context of a worldwide bank liquidation, the state banking regulator serves in the capacity of liquidator under state law. He or she will, however, pay only claims arising from that bank's operations in the state (but irrespective of where the claimant might reside), with the assets of the agency. If and when the state-law liquidator has paid in full, with interest, all creditors of the agency of the foreign bank, any surplus is remitted to the foreign bank. If the bank is in worldwide liquidation, the surplus is sent either to

the liquidators of the bank's headquarters or to another U.S. liquidation of that bank that may be insolvent.

In August, 1991, the Court Appointed Fiduciaries had filed petitions in the U.S. Bankruptcy Court for the Southern District of New York, under 11 U.S.C. § 304, commencing an ancillary proceeding. In the ancillary bankruptcy proceeding, the Court Appointed Fiduciaries sought to add all assets of BCCI held by the California Commissioner and the New York Superintendent to one pool of assets for all claimants worldwide. This was opposed by the California Commissioner, the New York Superintendent and the Federal Reserve. By a stipulated order entered in the U.S. bankruptcy proceedings in October, 1991, the assets in the state-law liquidations were fully carved out of the bankruptcy proceeding and left with the state-law liquidators exclusively. Under the Plea Agreement, the forfeitable property from the BCCI depository agencies was limited to any *surplus* generated in the New York and California liquidations.

a novel application of the Attorney General's § 1963(g) discretion under which the Attorney General(s) agreed prospectively to remit half of all forfeited assets to the Court Appointed Fiduciaries for distribution to the innocent victims. Thus, the Plea Agreement in fact represented a kind of partnership agreement between the Department of Justice and the Court Appointed Fiduciaries, under which they would jointly work to identify BCCI assets in this country and make them amenable to forfeiture.

With regard to forfeited assets, the Plea Agreement established the Worldwide Victims Fund and the U.S. Fund. Forfeited assets were to be disbursed in equal amounts to the Worldwide Victims Fund and the U.S. Fund. *See* Plea Agreement ¶ 11(c). The broad purpose of the Worldwide Victims Fund, operated by the Court Appointed Fiduciaries is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." *Id.* ¶ 14.

The purpose of the U.S. Fund was more specific, but no less compensatory. In addition to allowing for reimbursement of the costs of investigation and prosecution of BCCI, bank insurance and other matters, the U.S. Fund was also available to provide "restitution to victims of BCCI, which may include remission to the Court Ap-

pointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court–Appointed Fiduciaries to innocent worldwide victims of BCCI, and which may include claims related to the failure of CenTrust, if any." *Id.* ¶ 12(f).

This partnership between prosecutors and defendants was not universally welcomed. The Plea Agreement was opposed by competing BCCI branch liquidators, as well as various creditors, hoping to obtain preferential access to BCCI's assets in the United States. This Court considered hundreds of pages of submissions from objecting non-parties before accepting the Plea Agreement on January 24, 1992.[8] Ultimately, this Court accepted the Plea Agreement, finding:

> [T]he plea agreement now before the Court reflects on a truly global measure extraordinary efforts and amazing cooperation of a multitude of signatories representing a myriad of jurisdictions to fully settle actions against the corporate defendants, which had operated in 69 countries around the globe, and through that plea resolution, to locate and protect all realizable assets of BCCI for the ultimate benefit of the depositors, creditors, United States financial institutions, and other victims of BCCI. The promise of the plea agreement is that those extraordinary efforts, that amazing cooperation, shall continue.

Transcript at 5–6 (January 24, 1992). In accordance with 18 U.S.C. § 1963, this Court then entered an Order of Forfeiture. *See U.S. v. BCCI Holdings (Luxembourg) S.A.*, 1992 WL 100334 (D.D.C.1992).[9]

---

**8.** Each of the petitioners claimed that it had legal interests in the forfeited property, or causes of action against the defendants, that would be adversely affected if the defendants' property in this country were forfeited to the United States. Relying on 18 U.S.C. § 1963(i), the Court held that third parties lack standing to object to the entry of an order of forfeiture before the order is actually entered. The Court determined that under § 1963(i), third parties must wait until a preliminary order of forfeiture is entered, and then raise specific challenges to the forfeiture—to the extent that they have legal inter-

ests in the forfeited property—by filing petitions pursuant to § 1963(*l*). *See, e.g., U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of ICIC Investments)*, 795 F.Supp. 477, 479 (D.D.C.1992); *U.S. v. BCCI Holdings (Luxembourg), S.A. (In re Oppenheimer & Co.)*, 1992 WL 44321 (D.D.C.1992) (third party may not file interpleader action when ordered to surrender forfeited funds to the U.S. Marshals).

**9.** Under paragraph 9 of the Plea Agreement and pursuant to the Order of Forfeiture, BCCI forfeited all of its property interests in the United States. Pursuant to paragraph 1(e) of

## III. FORFEITURE PROCEEDING

Neither the parties nor the Court anticipated that the Plea Agreement and Order of Forfeiture would become a crucible for modern forfeiture law. Congress had amended RICO to include the forfeiture provision in 1984. *See First American,* 17 F.Supp.2d at 21; Terry Reed, *Criminal Forfeiture Under the Comprehensive Forfeiture Act of 1984,* 22 Am.Crim.L.Rev. 747, 750–76 (1985) (discussing legislative history of § 1963). In general terms, § 1963(*l*) establishes the procedure for a third party to assert that property should not be forfeited to the United States either because the third party had an interest in the property superior to that of the defendant at the time of the RICO violation or that the third party is a *bona fide* purchaser for value of the property with no knowledge that the property was subject to forfeiture. *See* 18 U.S.C. § 1963(*l*).

Because of the diversity of assets identified in the forfeiture proceeding, and the number of parties affected, this Court was called upon to adjudicate objections to forfeiture of specific assets based on such diverse legal grounds as the United States Constitution, international treaties, principles of federalism, principles of international comity, federal bankruptcy and interpleader law, and state common law principles. At the time these issues were raised, there was little judicial precedent to guide this Court in adjudicating the claims of third-party objectors.

In total, there were rulings on 175 claims filed pursuant to 18 U.S.C.1963(*l*) ("L claims"). As is discussed in detail in section VII below, these required the Court to interpret the criminal RICO statute in entirely new contexts, apply new provisions of Article 4A of the Uniform Commercial Code, and resolve numerous issues of first impression in banking and insolvency law. This Court, moreover, presided over a most unusual RICO proceeding, in which the criminal defendants (through the Court Appointed Fiduciaries) invested significant resources to provide assistance to the United States in the identification and realization of forfeitable assets, and in litigation of L claims by creditors seeking repayment from BCCI funds in the United States.

### A. Procedure for Amending the Order of Forfeiture

The purpose of the preliminary Order of Forfeiture was to identify the property of the defendants that would be forfeited as part of the defendants' sentence, and to allow the Government to commence the ancillary proceeding to resolve any third-party claims. *See* Fed.R.Crim.P. 32(d)(2). The preliminary order of forfeiture was final as to BCCI once entered but remained "preliminary" as far as other parties were concerned until all properly-filed third party claims were adjudicated.

In this case, the Court determined that the Preliminary Order of Forfeiture would contain a generic description of the forfeited property—*i.e.* all assets of the defendants found in the United States, with certain specified exceptions—and would set forth a schedule of the specific assets known to exist at the time the preliminary order was entered. Attached to the First Order of Forfeiture was a listing of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith. Because the Government was unable to verify certain information concerning additional forfeitable accounts at the time the Order of

the Forfeiture Order, the corporate defendants forfeited to the United States their ownership interests in all property located in the United States, including, without limitation, real property and all tangible and intangible personal property, however held, whether subsequently identified, determined or discovered in the course of the ongoing liquidation

proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of Court–Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates).

Forfeiture was entered, the Court issued a First Supplemental Order on January 31, 1992, *U.S. v. BCCI Holdings (Luxembourg) S.A.*, 1992 WL 34142 (D.D.C. Jan.31, 1992), which directed immediate seizure of the specific assets listed therein.

RICO affords the Government the opportunity to conduct post-conviction discovery "to facilitate the identification or location of property declared forfeited." *See* 18 U.S.C. § 1963(k). With substantial cooperation from the Court Appointed Fiduciaries, the Department of Justice conducted such discovery and identified substantial additional assets traceable to BCCI.

At the time, the applicable rules were silent as to how and when the Court may amend its Order of Forfeiture to include newly-discovered property subject to forfeiture. With approval from the Court, each time the Government identified another group of assets subject to forfeiture, it would move the Court to amend the Preliminary Order to add the newly-discovered property. On six occasions beginning January 31, 1992 and continuing until December 22, 1998, the court amended the Preliminary Order to include a Supplemental List of Forfeited Property that described additional assets that the Government has subsequently located.[10]

On each occasion, the Court made a preliminary finding, by a preponderance of the evidence, that the property discovered by the Government and included on the Supplemental List of Forfeited Property was, in fact, subject to forfeiture under § 1963(a). And on each occasion, the Court conducted an ancillary proceeding in which third parties could petition to amend the order of forfeiture to recognize their legal interests in the forfeited property.[11] *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Bank of California International)*, 980 F.Supp. 522 (D.D.C.1997) (the preliminary order may be amended as often as necessary to include additional property subject to forfeiture that the Government may identify through post-trial discovery).

The procedure adopted by this Court has been ratified by the Proposed Rule 32.2 of the Federal Rules of Criminal Procedure, which is likely to take effect on December 1, 2000.[12]

## B. Liquidation of Uncontested Forfeited Property

The property listed in the Preliminary Order of Forfeiture (January 24, 1992) and in the First Supplemental List of Forfeited Property (January 31, 1992), consisted primarily of deposits in various bank accounts. These assets, and many others that were subsequently added to the Preliminary Order, were entrusted to the U.S. Marshals Service to collect, invest, and

---

10. *See U.S. v. BCCI Holdings (Luxembourg) S.A.*, 795 F.Supp. 477 (D.D.C.1992) (Order of Forfeiture of July 29, 1992 (Second Order of Forfeiture)); Third Order of Forfeiture (Aug. 19, 1993); Fourth Order of Forfeiture (Dec. 21, 1994); Fifth Order of Forfeiture (Sept. 20, 1996); Sixth Order of Forfeiture (Dec. 22, 1998).

11. The Court was also required, of course, to give the defendants an opportunity to object to the amendment of the order of forfeiture to include newly-discovered property. In this case, the Court–Appointed Fiduciaries, acting on behalf of the defendants-in-liquidation, consented, on each occasion, to the amendment to the preliminary order.

12. Pursuant to the Rules Enabling Act, Proposed Rule 32.2 was approved by the Judicial Conference of the United States on March 16, 1999, and transmitted to the Supreme Court. It will take effect next year provided it is approved by the Supreme Court and not affirmatively disapproved by Congress.

The Proposed Rule creates a comprehensive set of procedures governing criminal forfeiture matters replacing current Rules 7(c)(2), 31(e) and 32(d)(2). Proposed Rule 32.2 provides that, "on the Government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that … is subject to forfeiture under an existing order of forfeiture but was located and identified after that order was entered." Rule 32.2(e)(1). Furthermore, it provides that whenever the court amends the order of forfeiture for this reason, it must conduct another ancillary proceeding. Rule 32.2(e)(2).

disburse pursuant to subsequent orders of the Court. In a number of instances, where the forfeited asset was residential real property, for example, or undeveloped land, the Marshals Service liquidated the property in accordance with its normal procedures in forfeiture cases.

In several instances, it appeared that the storage and maintenance costs associated with a particular asset could be mitigated by authorizing the Marshals to dispose of the property in an interlocutory sale. In these instances, the defendants had no objection to the interlocutory sale, but the property was the subject of a third-party claim that was then pending in the ancillary proceeding. To minimize unnecessary costs to the Government, while protecting the rights of the third-party claimants, the Court issued an order to show cause why the property could not be reduced to cash, with the cash becoming the subject of the third-party claim. In each instance where this procedure was employed, the third-party claimants offered no objection to the interlocutory sale, and the property was then liquidated by the Marshals. In all of these instances, the U.S. Marshals Service provided outstanding service to the Court, the Government, the Court Appointed Fiduciaries and the victims of the defendants' fraud. The Marshals managed an inventory of over $1 billion in assets, including some that presented peculiar problems of investment and liquidation, as well as expertise in the fields of securities and bankruptcy law. The Marshals Service demonstrated a level of competence and imagination in resolving nettlesome issues for which it should feel justly proud.

## IV. APPOINTMENT OF TRUSTEES

Not all of BCCI's assets in the United States, however, were amenable to liquidation by the Marshals Service. For example, the Plea Agreement confirmed that BCCI had a controlling interest in CCAH, the ultimate parent corporation of First American Corporation. It became necessary to determine the extent of that interest and find a means of liquidating that

interest. In addition, the United States had obtained the loan portfolios and real property interests of the BCCI agencies in New York and California, which required the assistance of an expert qualified to collect the outstanding loans and to liquidate ongoing businesses, including various hotels, apartment complexes and real-estate development projects.

Section § 1963(e) gives the Court broad powers to take such action as is necessary "to protect the interest of the United States in the property ordered forfeited." The Court interpreted that subsection to authorize the appointment of two Trustees: one to take control of First American and liquidate BCCI's interest therein, and another to liquidate the assets obtained from the BCCI agencies in New York and California.

### A. First American Trustee

As it turned out, BCCI's interest in First American Corporation amounted to only slightly more than 61 percent of the corporate stock. Early in the forfeiture proceeding, the Court Appointed Fiduciaries, the Department of Justice, the Board of Governors of the Federal Reserve System and the New York County District Attorney, and others, requested that the Court appoint a Trustee to take control of First American.

The question arose whether § 1963(e) authorized the appointment of a trustee to manage the assets of a third party corporation in which the defendant had only a partial interest. Section 1963(d) authorizes courts to issue pre-trial restraining orders to preserve the availability of property for forfeiture. This Court determined that if a third party's property could be restrained *pre-trial* to preserve the Government's interest in the property subject to forfeiture, then the court could appoint a trustee *post-conviction* to manage and liquidate third-party property so that the United States could realize its 61 percent interest. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Application of Clifford and Altman),* 980 F.Supp. 496 (D.D.C.1997). On a related point, the

Court held that she may require the non-forfeitable portion of the corporate property to be held in escrow to preserve the *status quo* until competing third-party claims were resolved in a separate case. *Id.* Finding the appointment of a Trustee was authorized and appropriate, the Court appointed Harry W. Albright, Jr., an eminent individual with extensive banking and governmental experience, as Trustee of First American Corporation ["First American Trustee"] on June 23, 1992. *See U.S. v. BCCI Holdings (Luxembourg) S.A.,* 1993 WL 332461 (D.D.C. Aug.19, 1993) (clarifying Order Appointing Trustee).

### 1. Early Stages of the Trusteeship

The purpose of the trusteeship was twofold. First, it would serve to sever all BCCI ties to First American Corporation through its off-shore parent companies (CCAH and CCAI) some of whose shareholders were accused of being BCCI nominees. Second, the appointment of a court-supervised federal RICO trustee, untainted by the BCCI affair, was to instill depositor confidence in First American and its subsidiaries and stabilize its deposit base in anticipation of First American's liquidation under the First American Trustee's supervision.

The Order Appointing Trustee directed the First American Trustee to collect and hold the shares of FAC stock and, with Court approval, to sell or otherwise dispose of such shares or to cause the Board of Directors of FAC and its wholly owned subsidiary, First American Bankshares, Inc. ("FAB"), to sell or otherwise dispose of all assets owned or controlled by FAC within one year and at the best price under the circumstances. *See* Order Appointing Trustee at 3. At the conclusion of that liquidation process, the Department of Justice and the Federal Reserve were to certify to the Court which portion of the CCAH stock had been owned by BCCI.

As with the Court Appointed Fiduciaries, the First American Trustee faced a bleak situation. News reports linking First American to BCCI had led to a run on deposits in the latter half of 1991. The Federal Reserve estimated that the total depositor and creditor liabilities of First American would exceed its assets upon liquidation by as much as $300 million. It was expected that the Federal Deposit Insurance Corporation ("FDIC") would ultimately be liable for that amount. Additionally, First American was a defendant in the above-mentioned civil lawsuits brought by BCCI depositors and the Republic of Panama, each seeking treble damages under RICO.

Compounding difficulties, the Trustee, as the sole shareholder, inherited a Board of Directors, which on the eve of the Trustee's appointment had voted to give management an extraordinary compensation package, notwithstanding the bank's dire straits.[13] It also became apparent that the Trustee and the existing Board and First American management team had conflicting views as to how First American's assets should be sold and whether First American should sue those who were instrumental in BCCI's illegal takeover of the bank.[14] The First American Trustee,

---

**13.** Prior to the Trustee's appointment, the Board of Directors of FAC had approved an executive incentive compensation plan that compensated eight individuals with payments exceeding $29 million. Ultimately, the Trustee approved a revised incentive compensation plan pursuant to which a larger group of 43 employees received incentive compensation rewarding them for their extraordinary efforts in accomplishing the expeditious sale of FAB's subsidiaries. The amount paid pursuant to the revised incentive compensation plan totaled approximately $7 million, saving $22 million when compared to the original plan.

**14.** Differences focused on the sale of First American's subsidiary, First American Metro Corp. ("Metro"), FAB's metropolitan Washington subsidiary. Existing management favored a purchase and assumption transaction, which carved out substantial non-performing assets (the "bad bank"). These were to be retained by FAB to be worked out over a five-year period in an *unregulated* real estate investment corporation ("REIC") managed by FAB's then management and financed by a

concerned by the insistence of some Board members that the compensation plan be adopted without change and by the conflict over strategy, reconstituted the First American Board of Directors in November 1992.

### 2. Sale of First American's Banking Assets

The Order Appointing Trustee required that First American's assets be sold *"provided* that the sale takes place expeditiously, but in any event within one year from the date of this Order or such further time as the Court may permit...." *See U.S. v. BCCI Holdings (Luxembourg) S.A,* 1993 WL 332461 *2 (quoting Order Appointing Trustee at 3). Acting with diligence and dispatch, the Trustee and the reconstituted First American Board held an auction, after which the stock of Metro was sold to First Union Corp. ("First Union") in a "whole bank" transaction. *See U.S. v. BCCI Holdings (Luxembourg) S.A.,* 1993 WL 229568 (D.D.C. June 16, 1993) (approving transaction).

Upon the completion of the sale of FAB's remaining assets,[15] the proceeds totaled $480,048,000 in cash; the specter of a $300 million shortfall dissipated. However, First American's assets remained encumbered by $264 million in potential liabilities consisting principally of accrued

liabilities for debts owed to the Abu Dhabi shareholders.

### 3. Liquidation of Remaining Assets

After the Metro subsidiary had been sold, the question arose whether to liquidate the remaining assets—including the pursuit of civil litigation filed by First American—through the First American Trust or whether all assets should be immediately turned over to the Department of Justice. The Court adopted the former approach and issued an extensive Procedural Order, which provided direction as to how proceeds of the First American liquidation were to be distributed to the United States and the Court Appointed Fiduciaries pursuant to the Plea Agreement. *See BCCI,* 1994 WL 1064141 (D.D.C. Dec. 21, 1994) ("Procedural Order").

### 4. Tax Issues

During the course of the trusteeship, the First American Trustee encountered a number of tax issues. Some related to whether distributions by him to the United States were taxable events, others related to assertions of tax liability by the Internal Revenue Service ("IRS") against First American for transactions that had taken place in 1986. While there may have been some miscommunications or changed positions, the net outcome was that the IRS

---

$300 million bridge loan from the Abu Dhabi shareholders of CCAH. Not only would this arrangement have involved a prolonged liquidation of poor assets, but the loan terms would have included a release of all claims First American might assert against the Abu Dhabi shareholders for their complicity in BCCI's fraudulent takeover.

By contrast, the Trustee favored a flexible bidding procedure, which would invite potential purchasers to structure their bids based on their own particular desires, strengths and competitive circumstances. The Trustee was prepared to approve the best bid, whether structured as a "whole bank" transaction in which the purchaser would acquire 100% of the stock of the subsidiary, or a "good bank/ bad bank" purchase and assumption transaction involving a substantial portion of Metro's assets, followed immediately by the bulk sale of assets not purchased by a winning bidder.

15. As reported to the Court at that time, the remaining assets of FAB subsidiaries, having an aggregate net book value of approximately $52 million, consisted principally of First Advantage Mortgage Company (the sale of which was then scheduled to close in August 1993 pending Court approval) and a portfolio of loans (performing and non-performing) and real estate retained after the sale of the banking business of FAB to Key Bank of New York ("Key Bank"). Upon court approval granted July 13, 1993, the sale of First Advantage Mortgage Company closed as scheduled. The remaining FABNY assets were disposed of under a plan for collection and bulk sale approved by the Court on February 28, 1994. The sale and disposition of those remaining assets was completed, in accordance with the plan, on April 29, 1994.

did not seek to impose tax liability on the Trustee or First American. Indeed, in recent weeks, senior IRS personnel worked diligently on a last remaining issue to accommodate this Court's June 30, 1999 target for entry of the Final Order of Forfeiture.

### B. State Liquidation Trustee

The Court also appointed Robb Evans, a person with extensive experience in banking and finance, to collect, liquidate, and transfer to the Marshals Service, the assets of the BCCI agencies in New York and California ("State Liquidation Trustee").[16] *See U.S. v. BCCI Holdings(Luxembourg.) S.A,* 1993 WL 70447 (D.D.C. Mar. 5, 1993) (Order Appointing Trustee). The March 5, 1993 Order, initially covered only the surplus from the California Commissioner, and directed "... that the Trustee shall proceed to liquidate all non-liquid assets as soon as practicable, taking into account the need to obtain fair market value for the properties in question and the importance of concluding the liquidation at an early date so that the liquidated funds may be disbursed as provided in the Plea Agreement and the Order of Forfeiture." *Id.* The Court further ordered "... that while the liquidation process is underway, the Trustee shall endeavor to collect all outstanding loan obligations and to manage all properties consistent with the need to preserve the value of the properties for sale." *Id.* By Order dated July 20, 1994, the Court directed the Trustee to receive and liquidate assets from the New York Superintendent, on the same basis as the assets received from the California Commissioner.

On February 1, 1995, the Court approved the substantive consolidation of the two asset portfolios, in the interest of efficiency. The State Liquidation Trustee has received all distributable assets from the California Commissioner, and all such assets save a cash reserve of approximately

$1.8 million from the New York Superintendent. Additional assets were added to the Trustee's estate, from sources other than the California Commissioner or the New York Superintendent, by orders dated September 20 and October 2, 1996, and December 22, 1998. The Trustee was thereby given charge for substantially all of the complex assets formerly owned by BCCI in the United States, other than its stock in other banks or bank holding companies.

As it became apparent that the scope and duration of the forfeiture-liquidation proceeding was surpassing early estimates, the Court directed the State Liquidation Trustee, by Order of November 22, 1995, to include in his quarterly reports a comparative cost-benefit analysis of expedited versus orderly sale of assets. The Court approved the Trustee's proposed methodology on February 14, 1996.

As of this date, the Trustee has realized approximately $347.4 million which has been sent to the Marshals Service. This amount reflects remarkable achievements. For example, the Trustee sold 17 parcels of real estate for a total of $53.9 million—an impressive $20.8 million over book value. This result was made possible, in part, by the unique position of a RICO Trustee. Because the Trustee was not balancing competing interests, but was rather maximizing the return for the United States, he had greater flexibility in liquidating assets than do court-appointed receivers or trustees in bankruptcy proceedings. Consequently, none of the properties sold by the Trustee were auctioned, as is done in bankruptcy cases, equity receiverships and foreclosures.

The Trustee approached each property sale separately. With regard to some of the hotels, significant changes were made: labor relations were improved and franchise agreements were renegotiated, in addition to physical improvements. Then the

---

**16.** Immediately prior to his appointment by this Court, Mr. Evans had been appointed in 1991 by the California Commissioner as a Special Deputy Superintendent of Banks and the Chief California Liquidator of BCCI.

BCCI Trustee dealt with purchasers as would an ordinary private-sector seller, not constrained by rigid time restraints or approval guidelines. And there was no spectre of a subsequent court-supervised overbid procedure to chill out-of-court negotiations.

Also striking, was the Trustee's collection of more than $48 million on outstanding loans. These loans had been under management of New York and California authorities for years prior to their addition to the Trustee's portfolio. Focus, tenacity, and effective litigation led to the Trustee's results.

The portfolio of assets under the State Liquidation Trustee's control is not fully liquidated. Remaining assets are valued at $19.3 million. The Court was notified in 1997 that the Attorney General had exercised her discretion under § 1963(g) to remit the United States' portion of proceeds from the State Liquidation Trustee to the Worldwide Victims Fund. That still is the policy of the United States, which has waived its interest in any future proceeds that the Trustee may realize in the course of liquidating the remaining assets. Consequently, Mr. Evans will continue to liquidate the remaining assets under a new trust agreement. He will be supervised directly by the Court Appointed Fiduciaries and will no longer be under the supervision of this Court.

### C. Trustees' Performance

Both Mr. Albright and Mr. Evans were highly recommended to the Court as persons who each had extensive banking and governmental experience along with the seasoned business judgment necessary to accomplish the arduous task set before them. Even with these glowing introductions, it need be said that both Trustees exceeded the Court's most optimistic expectations. Both Trustees faced a number of hard decisions regarding the timing and disposition of certain assets as well as how to pursue litigation and when to settle litigation. Both Trustees, along with their diligent and able counsel and staffs, de-

serve resounding plaudits from the BCCI victims. A more detailed account of the significant events in the life of each Trust will be presented in each Trustee's final report, to be filed with this Court on or before September 30, 1999.

### V. CIVIL CASES

During the same time period in which this Court adjudicated third party claims related to forfeited BCCI assets, five civil cases connected to the BCCI liquidation proceedings became part of this Court's docket. The first of these was initiated in 1993 by First American with the blessing of the First American Trustee. The mammoth lawsuit was filed against thirty defendants alleged to have participated in BCCI's illegal ownership scheme. The named defendants included the former record shareholders of CCAH, including, for example, members of the Abu Dhabi royal family, other prominent persons from the Middle East, including the Rulers of Ajman and Fujeirah and Sheikh Mohammed of Dubai, as well as Clark Clifford and Robert Altman. The complaint asserted RICO claims common law claims for fraud, breach of fiduciary duty and civil conspiracy. *See First American Corp. v. Al–Nahyan*, 948 F.Supp. 1107, 1112–15 (D.D.C. 1996) (detailing parties and allegations in complaint). Settlements were reached with most defendants relatively early in the case. Under these settlement agreements parties paid First American and/or relinquished their stock in CCAH as well as their sizable claims against, or debts owed by, First American. The action was set for jury trial in October 1998, *see First American Corp. v. Al–Nahyan*, 17 F.Supp.2d 10, 13 (D.D.C.1998), and was settled with the remaining defendants, including Clifford and Altman, shortly before that date. *See BCCI Holdings (Luxembourg) S.A. v. Khalil*, 182 F.R.D. 335, 336 (D.D.C.1998).

Soon after the final settlement was concluded, the Court entered twelve separate default judgments against six defendants

in that lawsuit. Those default judgments are for (1) compensatory damages of up to $500 million in connection with the common law fraud claims and (2) treble damages in connection with the RICO claims in the maximum amount of $1.5 billion. The Orders signed today distribute the RICO judgments to the Department of Justice for enforcement and collection.

The second civil suit was filed by the Court Appointed Fiduciaries against the partners of Clifford and Altman's law firm, Clifford & Warnke, and others for their role in BCCI's takeover of First American. Although the Court Appointed Fiduciaries had caused the BCCI corporations to plead guilty to criminal charges in this regard, the Plea Agreement was "not intended by the parties hereto to preclude the criminal prosecution or any civil action against any culpable BCCI officers, employees, agents or other entities (other than BCCI) or wrongdoers." Plea Agreement at 6. When defendants in this civil suit sought dismissal, the Court found that it would be "contrary to the intent of the parties and this Court's understanding when she accepted that plea" to preclude the Court Appointed Fiduciaries from bringing actions against alleged third-party wrongdoers. *BCCI Holdings (Luxembourg) S.A. v. Clifford*, 964 F.Supp. 468, 477–478 (D.D.C.1997). The case was settled on confidential terms in 1998.

**17.** Clifford and Altman filed similar or identical indemnification actions in the Superior Court of the District of Columbia, and a suit demanding payment of invoices for legal fees submitted to First American by their former law firm, Clifford & Warnke. The indemnification cases ultimately were stayed in favor of the action pending in this Court, and the Clifford & Warnke invoices case was dismissed with prejudice after months of motions practice and discovery. *See, e.g., Clifford, as Managing Partner of Clifford & Warnke v. First American Corp.*, Civil Action No. 7071–95 (D.C.Super. Dec. 9, 1996) (dismissing amended complaint with prejudice); *Clifford v. First American Corp.*, Civil Action No. 6477–96 (D.C.Super. Dec. 3, 1996) ("Staying this matter in favor of the previously filed federal action").

Two additional civil cases were filed by Clifford and Altman seeking, inter alia, indemnification under Virginia corporate law for millions of dollars in legal fees and expenses incurred in connection with their successful defense against criminal charges in this Court and in New York, their defense against administrative charges filed by the Board of Governors of the Federal Reserve System, their appearances to give congressional testimony, and their defense against the lawsuit filed by First American.[17] These cases were all resolved as part of the settlement of First American's lawsuit.

The fifth civil suit was brought by the Court Appointed Fiduciaries against a wealthy Saudi businessman, a BCCI insider, and two corporations owned by the two alleging RICO and common law violations. That case was tried to the Court earlier this year, and a $1.1 billion decision in favor of the Court Appointed Fiduciaries was rendered several days ago. *See BCCI Holdings (Luxembourg) S.A. v. Khalil*, 56 F.Supp.2d 14 (D.D.C.1999).

## VI. SETTLEMENTS

The pursuit of these civil cases, as well as vigorous criminal prosecutions by the New York County District Attorney and the United States Department of Justice, ultimately inured to the victims' benefit

Clifford and Altman also commenced several "miscellaneous actions" in this Court related to the forfeiture proceeding, demanding indemnification, payment of stock and debenture claims and disclosure of confidential information. *See, e.g., Order, U.S. v. BCCI Holdings (Luxembourg). S.A. (In re Mot. of Clifford and Altman)*, Crim. No. 91–0655 (D.D.C. Aug. 22, 1996), *aff'd sub nom., Clifford v. United States*, 136 F.3d 144 (D.C.Cir. 1998); *Order, In re Application for Relief from Trustee's First Distribution Plan Pursuant to the 1994 Procedural Order in U.S. v. BCCI Holdings 91–CR–0655*, Misc. No. 96–0367(JHG) (D.D.C. Aug. 16, 1997); *Order, U.S. v. BCCI Holdings (Luxembourg), S.A.*, Crim. No. 91–0655 (D.D.C. Dec. 7, 1994).

because they produced sizable settlements or agreed-to criminal fines.

The pivotal agreement resolved both civil and criminal charges against the sovereigns of Abu Dhabi, who had formally taken control of BCCI in 1990 and who also were record shareholders of First American to whom the bank purportedly owed a substantial amount. In a global agreement reached between the Abu Dhabi sovereigns and the Department of Justice, the Federal Reserve, the District Attorney of New York County, and First American in Geneva, Switzerland (the "Geneva Agreement"), the Abu Dhabi parties released all claims against First American, including release of all debt obligations, thus reducing First American's liabilities by $239 million. In addition, the Abu Dhabi parties relinquished a 28 percent stock ownership interest in CCAH, with the proceeds attributable to that interest to be transferred to the Federal Reserve for the ultimate benefit of the innocent victims of the BCCI debacle. The relinquishment of these debt claims and stock ownership interests increased the amounts ultimately distributed to the parties entitled to receive them. To date, the Geneva Agreement has resulted in remission of more than $170 million to the Court Appointed Fiduciaries.

Pursuant to the Geneva Agreement, the Abu Dhabi parties also agreed to transfer to the Court Appointed Fiduciaries more than 80 tons of BCCI records that had previously been sequestered in Abu Dhabi. This document collection, which represented the files of audit and majority shareholder investigative committees, as well as the working files for BCCI's central administration, was shipped to the Court Appointed Fiduciaries (in six planeloads) in April 1994. The records restored to the Court Appointed Fiduciaries under this agreement have been invaluable in the development and litigation of civil actions by the Court Appointed Fiduciaries. Among these cases was the above-referenced *Khalil* case.

In addition to the Geneva Agreement, the United States' and New York County's plea agreement with Sheikh Kamal Adham yielded more than $85 million to the Court Appointed Fiduciaries for the benefit of creditors and depositors. Similarly, a settlement between Sheikh Khalid Bin Mahfouz and United States authorities resulted in approximately $190 million being paid to the Court Appointed Fiduciaries with an additional $10 million paid to First American. Pursuant to settlements between Clifford and Altman and the Federal Reserve and a separate settlement with First American, approximately $5 million was paid to the Court Appointed Fiduciaries. A settlement between the District Attorney of New York County and Faisal al-Fulaij resulted in an additional $1 million being paid to the Court Appointed Fiduciaries. These settlements were over and above substantial private civil settlements that the Court Appointed Fiduciaries concluded with these parties.

## VII. OVERVIEW OF ISSUES ARISING FROM THIRD PARTY CLAIMS

The remainder of this Opinion describes the novel legal issues—procedural and substantive—that arose during adjudication of third party claims under the RICO forfeiture provision.

In a RICO forfeiture, the Government is entitled to seek forfeiture of only the defendant's interest in property that was derived from, or was used to commit, the criminal offense. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Chawla),* 46 F.3d 1185, 1190 (D.C.Cir. 1995). In this case, once the Court accepted the Plea Agreement and entered the Order of Forfeiture (as amended), BCCI's interest in BCCI-related property was terminated. The only remaining issue before the United States could perfect its title to the forfeited property was whether there were third parties whose interest in the subject property was sufficient to defeat the United States' claim to title.

The RICO forfeiture provision sets forth an orderly procedure by which third parties seeking to recover interests in forfeited property may obtain judicial resolution of their claims. The statute provides:

> Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice … petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

18 U.S.C. § 1963(*l*)(2). Section 1963(*l*)(6) sets forth the substantive elements that a third party must establish to obtain amendment of an order of forfeiture:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—
>
> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;
>
> the court shall amend the order of forfeiture in accordance with its determination.

18 U.S.C. § 1963(*l*)(6).

▪ In short, an L-claim may only be raised by a person "other than the defendant" and that person can prevail only if she can demonstrate either (A) that she had a superior interest in the property to that of the defendant at the time the defendant committed the RICO violation, or (B) that after the violation, she purchased the defendant's interest in the property, or a superior interest, and did not have reason to believe the property was subject to forfeiture when she acquired her interest. *See, e.g., U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Pacific Bank)*, 956 F.Supp. 5 (D.D.C.1997) (purpose of L-claim proceeding is to ensure forfeited property belongs to the defendant not to divide defendant's estate among competing creditors); *U.S. v. BCCI Holdings (Luxembourg) S.A. (Petition of Kurshid Alam)*, No. 91–0655 JHG (D.D.C. Apr. 28, 1999) (unpub.) (when debt owed by a third party to defendant is forfeited in a criminal case, only issue in L-claim proceeding is ownership of the debt).

Of the 175 L-claims filed in this case, many fell into discrete categories: (1) liquidators of the BCCI overseas branches, who sought to obtain BCCI property in the United States for distribution to their local creditors; (2) depositors who sought return of their deposits abroad from BCCI assets here; (3) commercial banks whose wire transfers of funds through BCCI were interrupted by the July 5, 1991 seizure; (4) tort claimants against BCCI, such as the Republic of Panama; and (5) trade creditors. In the course of adjudicating these claims, the Court, by necessity, filled in gaps in the statute regarding the applicable procedure for L-claims as well as the relation between federal forfeiture law and state property law when determining whose interests should prevail. What follows is a brief summary of how the procedural and substantive issues that arose were resolved.

### A. Whether the Claimants Were Persons "Other Than the Defendant"

▪ The L-claim proceeding is for the benefit of third parties; it is not a device to give the defendant a second opportunity to litigate the forfeiture. If property held jointly by the defendant and a third party

is forfeited in a criminal case, the defendant's interest is extinguished by the entry of the preliminary order, while the third party's interest, if any, is determined in the ancillary proceeding. The same is true if the Government forfeits property held in the name of a nominee. If the defendant is the true owner, his interest is forfeited by the preliminary order; the putative nominee can challenge the forfeiture in the ancillary proceeding, but the defendant cannot.

Consequently, a threshold question for any L-claim was whether the claimant was in substance a legal "person" other than the corporate BCCI defendants. The issue had procedural and substantive components. Procedurally, the L-claim proceeding was available only to persons other than the defendant; Congress established no procedure for adjudicating the threshold question of whether a putative L-claimant was entitled to proceed under § 1963(*l*). Substantively, the question arose as to which law to apply to determine the legal status of the claimant and how that law applied in any given case.

With regard to threshold procedure, the Court determined that the Government must first establish, by a preponderance of the evidence, that the property in question was subject to forfeiture and that the person or entity holding the property was the *alter ego* of one of the defendants. At this stage, only the defendants—and not the putative *alter ego*—were permitted to object to the Government's motion to amend the preliminary order of forfeiture to include the newly-discovered property. *See* § 1963(i).

Once the Court made a finding that the property was subject to forfeiture and that the *alter ego* theory applied, the Government was required to give the *alter ego* entity notice of the forfeiture and an opportunity to contest the court's finding in the ancillary proceeding. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of ICIC Investments)*, 795 F.Supp. 477, 479 (D.D.C.1992) (assets of corporation that was *alter ego* of defendant found

subject to forfeiture); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Banco Central Del Uruguay)*, 977 F.Supp. 27 (D.D.C.1997) (court may disregard corporate form and order the forfeiture of *alter ego's* assets as part of preliminary order of forfeiture, based solely on information in Government's affidavit; but *alter ego* may challenge the forfeiture in the ancillary proceeding).

After the Order of Forfeiture was amended, the Court allowed the alleged *alter ego* to contest the Court's preliminary determination by filing an L-claim; however, the claim had to allege facts sufficient to demonstrate that the Court's *alter ego* finding had been in error. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Banco Central Del Uruguay)*, 977 F.Supp. 27 (D.D.C.1997).

This principle was also applied in the context of L-claims filed by liquidators of local branches of BCCI seeking to exclude so-called "branch" assets from the ambit of the forfeiture. Branch liquidators were generally required by local law to prefer local branch creditors over foreign creditors of that branch, and over creditors of the corporation. Thus, branches that held greater cash reserves were able to pay local creditors a much higher percentage on their claims than branches that had fewer assets in their possession at the time of closure.

The branch liquidators claimed that, as a matter of foreign law—*i.e.*, the law of the countries in which they were doing business—they would be considered separate juridical entities, and thus should have standing to contest the forfeiture of the BCCI defendants' assets. This Court rejected that claim, holding that the term "other than the defendant" in the RICO statute is interpreted according to federal law, and under federal law, a corporation and its branches are considered a single entity. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Branches of Defendant BCCI (Overseas) Limited, et al.)*, 833 F.Supp. 32, 38–39 (D.D.C.1993) ("Be-

cause unincorporated divisions and their parents cannot be considered separate entities for the purpose of indictment, it would be anomalous to consider them separate entities for the purpose of determining standing to file a petition pursuant to § 1963(*l* ).”), *aff'd,* 48 F.3d 551· (D.C.Cir. 1995).

### B. Procedure for Filing a Third–Party Claim

Most of the claims filed in this case were filed by independent third parties that petitioned the court to amend the preliminary order of forfeiture to recognize some legal interest the third party asserted. With 175 separate claims, the Court addressed myriad procedural issues. In the absence of specific guidance from the RICO provisions, the Court adopted and adapted the Federal Rules of Civil Procedure to resolve particular procedural issues.

### 1. Multiple claims

Each of the six amendments to the Preliminary Order of Forfeiture prompted a round of L-claims. Eighty-seven L-claims were filed in response to the original order of forfeiture and the First Supplemental List of Forfeited Property,[18] and more than 20 L-claims were filed in response to each of the next two Supplemental Lists.

Section 1963(*l* )(4) provides that L-claims should be resolved within 30 days “to the extent practicable and consistent with the interests of justice.” 18 U.S.C. § 1963(*l* )(4). It was impracticable to resolve such a large number of claims within 30 days. Accordingly, the Court issued a scheduling order that directed the United States to group the claims into categories—e.g. claims filed by creditors, claims filed by BCCI’s foreign branches, etc.; to determine which claims might be disposed of on dispositive motions and which might require discovery and a hearing; and to begin filing dispositive motions in accor-

dance with an orderly schedule, beginning first with the categories of L-claims that presented legal issues common to most of the other claims, and proceeding to the more esoteric issues later.

By adopting this procedure, the Court resolved numerous L-claims on dispositive motions in a relatively short period of time. Where the Court determined that an evidentiary hearing would be required to resolve factual disputes, the Court allowed discovery and required the filing of “position papers” that were the equivalent of pretrial statements. Many of those matters were ultimately settled between the parties, with the Court entering an Order approving the settlement. With respect to each of the L-claims that were dismissed on the Government’s motion, the court entered a “final judgment” stating that all issues between the Government and the petitioner had been resolved, and that there was no just reason for delay in allowing the petitioner to appeal. Thus, consistent with Rule 54(b) of the Federal Rules of Civil Procedure, third-parties whose L-claims were dismissed were able to take their appeals without having to wait for all litigation involving all 175 L-claims to be resolved. A total of 24 of this Court’s rulings on L-claims were appealed to the Court of Appeals for this Circuit. All were affirmed.

### 2. Dispositive motions

As noted, the Court held that it was not necessary to conduct a hearing on the merits of an L-claim if the matter could be disposed of in the context of a motion to dismiss. The Court incorporated the standards for dismissing a civil complaint set forth in Rule 12(b) of the Federal Rules of Civil Procedure to the Government’s motions to dismiss L-claims. *E.g., U.S. v. BCCI Holdings (Luxembourg), S.A. (Petitions of General Creditors),* 919 F.Supp. 31 (D.D.C.1996) (“If a third party fails to

---

**18.** The first phase of the ancillary proceeding (“Round One”) was consolidated so that L-claims could address property listed either in

the original preliminary order or the First Supplemental List, which was issued just seven days after the preliminary order.

allege in its petition all elements necessary for recovery, including those relating to standing, the court may dismiss the petition without providing a hearing"); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Banque Indosuez)*, 961 F.Supp. 282 (D.D.C.1997).[19]

Similarly, in several cases, the Government sought to dispose of the L-claim by filing a motion for summary judgment. In those cases, the Court applied Rule 56 of the Federal Rules of Civil Procedure. *See, e.g., U.S. v. BCCI Holdings (Luxembourg), S.A. (Petitions of People's Republic of Bangladesh and Bangladesh Bank)*, 977 F.Supp. 1 (D.D.C.1997).

### 3. Compliance with the filing requirements

Section 1963($l$)(3) establishes filing requirements for L-claims. In a number of cases, the Court dismissed L-claims for failure to meet the filing requirements. For example, in *U.S. v. BCCI Holdings (Luxembourg), S.A. (Fifth Round Petition of Liquidation Comm'n for BCCI (Overseas) Macau)*, 980 F.Supp. 1 (D.D.C.1997), the Court held that an L-claim not signed under penalty of perjury and failing to identify the asset in which the claimant asserted an interest, and the nature of that interest, did not comply with § 1963($l$)(3).[20] In other cases, the Court granted motions to dismiss L-claims that were not timely filed under § 1963($l$)(2). That provision requires that all L-claims be filed within 30 days of the final publication of notice of the forfeiture, or within 30 days of the receipt of personal notice, whichever is earlier.[21]

The Court also dismissed a number of L-claims for failure to comply with the rule in this Circuit that corporations be represented by counsel. *See Bristol Petroleum Corporation v. Harris*, 901 F.2d 165 (D.C.Cir.1990). In those cases, the Court gave the corporate claimants notice of the requirement and an ample opportunity to have counsel enter an appearance. When no such appearance was entered, the court dismissed the L-claims *sua sponte.*

Finally, the Court held that sanctions under Rule 11 of the Federal Rules of Civil Procedure may be imposed on counsel who knowingly file frivolous L-claims. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Scarfone)*, 176 F.R.D. 1 (D.D.C.1997) (claimant's attorney may be liable to Rule 11 sanctions for filing repetitive, meritless claims, but Government must give attorney proper warning that it will seek sanctions).

**19.** *See also* Fed.R.Crim.P. 32.2(c)(1)(A) (proposed): "In the ancillary proceeding, the court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reasons. For purposes of the motion, the facts set forth in the petition are assumed to be true."

**20.** *See also U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of BCCI Campaign Committee)*, 980 F.Supp. 16 (D.D.C.1997) (petition dismissed because not signed under penalty of perjury). In *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Richard Eline)*, 916 F.Supp. 1286 (D.D.C.1996), the Court found insufficient a claim that listed random legal phrases and failed to set forth the nature and extent of the legal interest in the forfeited property as required by § 1963($l$)(3). And in *U.S. v. BCCI Holdings (Luxembourg), S.A. (Fourth Round Petitions of General Creditors)*, 956 F.Supp. 1 (D.D.C.1996), the Court held that a petition stating little more than "the property belongs to me" was insufficient.

**21.** *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petitions of B. Gray Gibbs et al.)*, 916 F.Supp. 1270 (D.D.C.1996); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Bank of California International)*, 980 F.Supp. 522 (D.D.C.1997) (claim filed more than 30 days after notice is untimely; claimant cannot wait until court amends preliminary order of forfeiture to include additional property to file claim to property included in the original order). *But see U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Indosuez Bank)*, 916 F.Supp. 1276 (D.D.C.1996) (court may "equitably toll" time for filing claim if claimant demonstrates due diligence); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Delphis Bank)*, 1992 WL 753228 (D.D.C.1992) (where Government sends two notices to claimant at different addresses, and claimant reasonably believed it had 30 days from second notice to file claim, court may waive statutory requirement).

#### 4. Subject matter jurisdiction

A number of L-claims were dismissed because the court lacked jurisdiction over the asset in which the claimant asserted an interest. As mentioned, the Court amended the preliminary Order of Forfeiture six times to include newly discovered assets, and on each occasion, directed the Government to publish notice of the amended order so that third parties could file L-claims in another round of the ancillary proceeding. On some occasions, claimants sought to challenge the forfeiture of property which was not included in the most recently issued Supplemental List of Forfeited Property.

For example, in *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petitions of Zaman and Bhandari)*, 977 F.Supp. 20 (D.D.C. 1997), the claimants asserted interests in assets that were not among those the Government had recovered from the defendants. In *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Ahmed)*, 923 F.Supp. 264 (D.D.C.1996), the claimant asserted an interest in an asset that the Government hoped to include in a future amendment to the order of forfeiture, but which was not included in the order as of that time.[22] In these cases, the Court held that it lacked subject matter jurisdiction over the L-claim because the property in which the third party asserted an interest was not before the Court.

Similarly, in *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Bank of California International)*, 980 F.Supp. 522 (D.D.C.1997), the claimant asserted an interest in property that was included in an *earlier* amendment to the order of forfeiture (for which the time for filing an L-claim had long since expired), but was not included in the most recent amendment to the order. The Court held she lacked jurisdiction to entertain a claim to property not included in the present amendment to the forfeiture order because it was only the present amendment that the claimant had a right to challenge by filing a timely claim. It was the claimant's responsibility to file a timely L-claim challenging that amendment.

Finally, the Court dismissed an L-claim for lack of subject matter jurisdiction to the extent that the claimant asserted an interest in a sum of money in a bank account that was greater than the amount of money the Government recovered. In that case, the Court had subject matter jurisdiction only over the amount included in the amendment to the order of forfeiture, not the amount the claimant asserted ought to have been in the bank account. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Hubei Provincial)*, 980 F.Supp. 2 (D.D.C.1997).

#### 5. Discovery

Section 1963(k) provides for the taking of post-trial discovery "in order to facilitate the identification or location of property declared forfeited, and to facilitate the disposition of petitions for remission or mitigation of forfeiture." This is a useful tool, in a case such as this, where the Government has obtained an order forfeiting certain categories of property, but has not traced or otherwise identified specific assets at the time the preliminary order is entered. But neither § 1963(k) nor any other part of the forfeiture statute provides explicit authority to conduct discovery in the ancillary proceeding.

In this case, the Court inferred from the statute that factual disputes arising from an L-claim may be explored through traditional civil discovery. *See U.S v. BCCI Holdings (Luxembourg), S.A. (Petition of Department of Private Affairs)*, 1993 WL

---

**22.** The Court noted in that case that sending notice of the forfeiture to the claimant does not estop the Government from asserting that the funds in which the claimant allegedly had an interest were not forfeited. The Government should be encouraged to send notice to as wide a list of potential claimants as possible, without fear that in doing so it will be held to have conceded either that the claimant receiving the notice has standing to file an L-claim, or that the property claimed by the claimant was in fact included among the assets forfeited by the defendant.

760232 (D.D.C.1993) (Government may take discovery from claimant). The Court also held that the Government need not make its discovery requests immediately when the L-claim is filed, but instead may withhold such requests until the court rules on the Government's motion to dismiss the L-claim. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Banque Indosuez)*, 961 F.Supp. 282 (D.D.C.1997). On a related point, the Court held that an L-claim may be dismissed as the sanction for failure to comply with the discovery requests. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of BCP)*, 169 F.R.D. 220 (D.D.C.1996).

This Court's procedural approach has been adopted in Proposed Rule 32.2, which provides that after disposing of a motion to dismiss, and before conducting a hearing on the third party's petition, "the court may permit the parties to conduct discovery in accordance with the Federal Rules of Civil Procedure if the court determines that discovery is necessary or desirable to resolve factual issues." The proposed Rule also provides that "when discovery ends, a party may move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure." Prop.Fed. R.Crim.P. 32.2(c)(1)(B)

### 6. Constitutional Challenges on Procedural Grounds

Only a few claimants raised constitutional challenges to the Court's L-claim procedures. In response to a due process challenge, the court held that § 1963(*l*) provides third parties with all the process due. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of American Express Bank II)*, 961 F.Supp. 287 (D.D.C. 1997). The Court also rejected the same claimant's argument that the Supreme Court's decision in *U.S. v. James Daniel Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (Government may not seize real property without affording owner notice and opportunity for pre-seizure hearing), applied to the ancillary proceeding. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of American Express Bank II)*, 961 F.Supp. 287 (D.D.C.1997).

### VIII. SUBSTANTIVE LAW IN THE ANCILLARY PROCEEDING

The remaining issues addressed substantive questions of law that arose repeatedly in applying the standing requirements of § 1963(*l*)(2), and in interpreting the two grounds on which relief can be granted under § 1963(*l*)(6).

### A. Standing

### 1. Choice of law

Standing to file a claim in the ancillary proceeding is limited to persons, other than the defendant, "asserting a legal interest in property which has been ordered forfeited to the United States." 18 U.S.C. § 1963(*l*)(2). In determining whether a claimant has asserted the requisite legal interest, the Court was immediately confronted with the issue of whether federal or state law should apply.

The Court held that the question of standing has two parts, and that federal and state law apply to each part, respectively. The nature of the claimant's interest is determined by reference to applicable state property law, but the determination of whether such an interest defeats the United States' claim to the property under § 1963(*l*) is a matter of federal law. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of American Express Bank II)*, 961 F.Supp. 287 (D.D.C.1997).

When applying the second part of this analysis, this Court took notice of, but was not bound by, collateral decisions of state courts that may relate to the particular property that is the subject of the third-party's claim because a state court cannot limit or pre-empt a federal forfeiture order. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Bank of New York)*, 980 F.Supp. 522 (D.D.C.1997). On the other hand, this Court need not grant collateral review to the final order of a

state court that has determined the property interest of the criminal defendant vis a vis the third party. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Madero)* 977 F.Supp. 33 (D.D.C.1997) (federal court will not grant collateral review to state court order transferring title to property from third party to defendant in foreclosure action; therefore claimant had no interest and lacked standing).

## 2. Creditors and other victims

Many of the L-claims were filed by persons asserting that they were creditors to whom BCCI owed a sum of money at the time BCCI was shut down by banking regulators worldwide. These included BCCI's depositors, trade creditors, and entities to which BCCI owed contractual obligations of other kinds.[23] The court held that only secured creditors have the requisite legal interest, as a matter of federal law, to satisfy the standing requirements of § 1962(1)(2). That is because only secured creditors have an interest "in the forfeited property," as the statute requires. Unsecured creditors have a legal interest in the defendant's estate as a whole, but they lack any specific interest in the particular asset that has been forfeited to the Government. It is only such specific interests that the ancillary proceeding was designed to protect. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Pacific Bank)*, 956 F.Supp. 5 (D.D.C.1997) (the only purpose of the ancillary proceeding is to ensure that the forfeited property belongs to the defendant; it does not attempt to divide the defendant's estate among competing creditors; therefore claimants must have an ownership or possessory interest in the forfeited property). As to each claim, the court determined, as a matter of state law, whether the creditor's interest was secured or unsecured, and found that only the secured creditors had standing to contest the forfeiture action in the ancillary proceeding.[24]

Another large group of claims fell, ultimately, into the same category. A number of individuals, banks and businesses around the world were in the process of sending funds by wire from one place to another on July 5, 1991 when BCCI was seized by bank regulators. In cases where those transfers originated from, were intended to terminate in, or simply passed through BCCI's various branches, it was possible for the funds to be in a BCCI account at another bank at the time the

---

**23.** *See, e.g., U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Bolton, et al.)*, 814 F.Supp. 106 (D.D.C.1993) (individual depositors) (hereinafter *"Petition of Bolton"*); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Chawla, et al.)*, 833 F.Supp. 9 (D.D.C. 1993), *aff'd*, 46 F.3d 1185 (D.C.Cir.1995) (purported class of depositors and creditors); *U.S. v. BCCI Holdings Luxembourg, S.A. (Petition of Seravaseiyar, et al.)*, 833 F.Supp. 17 (D.D.C.1993) (individual depositors); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Bank of New York, et al.)*, 833 F.Supp. 22 (D.D.C.1993) (trade creditors) (hereinafter *"Petition of BONY"*)

**24.** *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Chawla)*, 46 F.3d 1185 (D.C.Cir.1995), *aff'g* 833 F.Supp. 9 (D.D.C. 1993); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of OAS)*, 73 F.3d 403 (D.C.Cir. 1996) (depositor, Organization of American States, was entitled to no special status in the ancillary proceeding despite treaty obligations of the United States respecting its property,

because it was only a general creditor and therefore it was the defendant's property, not the claimant's, that was forfeited); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Banca Nazionale Del Lavoro)*, 977 F.Supp. 449 (D.D.C.1997) ("nostro" account of another bank is a general deposit entitled to no special status in the ancillary proceeding; depositor is a general creditor); *U.S. v. BCCI Holding (Luxembourg), S.A. (Petitions of General Creditors)*, 919 F.Supp. 31 (D.D.C.1996) (rejecting for lack of standing claims based on breach of contract, letter of credit, bank deposit, and employer/employee relationship); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petitions of Bolton, et al.)*, 814 F.Supp. 106 (D.D.C.1993) (bank depositors); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petitions of Seravaseiyar, et al.)*, 833 F.Supp. 17 (D.D.C.1993) (same); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Credit Suisse)*, 833 F.Supp. 22 (D.D.C.1993) (trade creditors); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Scarfone)*, 841 F.Supp. 1 (D.D.C.1993) (claim based on breach of contract).

shut down occurred. Many of the originators and intended beneficiaries of these incomplete wire transfers filed L-claims, asserting that the funds in the frozen BCCI accounts actually belonged to them and not to BCCI.

Funds that actually belong to a third party may not, of course, be forfeited in a criminal case, even if the money is found in the defendant's bank account. The question was whether the electronic funds in question belonged to the originators and/or the intended beneficiaries of the incomplete transfers, or whether the money had become, in the course of the transfer operations, the property of BCCI. To resolve this issue, the Court interpreted state law, in particular Article 4A of the Uniform Commercial Code as enacted by the State of New York, the place where most if not all of the wire transfer activities took place. Applying Article 4A, the Court found that some funds belonged to the originators of the transactions but most belonged to BCCI. Persons who have, as a matter of state law, voluntarily transferred their property interest to the defendant are no longer the owners of that property,

and are in no greater position to assert a claim to that property under § 1963(1)(2) than are other creditors and victims who cannot trace their former property into the defendant's account. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Bank Austria)*, 1997 WL 695668 (D.D.C. 1997), *as modified by*, 994 F.Supp. 18 (D.D.C.1998). The claimants in those cases were merely unsecured creditors who lacked standing to contest the forfeiture and who therefore had to look to the worldwide liquidation proceeding to recover a portion of their claims along with all other unsecured creditors.[25]

■ The same rule applied to tort victims who claimed that BCCI owed them money as a consequence of some tortious injury, such as fraud. A fraud victim who voluntarily transferred property to the defendant has a cause of action in tort against the defendant but has no greater interest in the forfeited property than does any other general creditor. Title to the funds in question no longer belongs to the victim; it belongs to the defendant.[26]

---

25. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Banca Monte dei Pasch di Siena)*, 977 F.Supp. 443 (D.D.C.1997) (intended beneficiary of incomplete wire transfer has only a cause of action against sender to whom funds were returned); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of State Trading Organization)*, 977 F.Supp. 12 (D.D.C.1997) (intended beneficiary of incomplete wire transfer has no interest in funds that defendant/intermediary bank improperly retained; at most sender of the funds is an unsecured creditor of the intermediary bank); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petitions of Zaman and Bhandari)*, 977 F.Supp. 20 (D.D.C.1997) (originator and beneficiary of incomplete wire transfer are both general creditors of defendant bank that unlawfully retained the money); *see also U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Pacific Bank)*, 956 F.Supp. 5 (D.D.C.1997) (person who mistakenly transferred funds to defendant's bank account after account was frozen by the Government is merely a general creditor with cause of action against defendant for return of its money); *U.S. v. BCCI Holdings (Luxembourg) S.A. (Petition of Bank Austria)*, 1997 WL 695668 (D.D.C.1997) (same); *U.S. v.*

*BCCI Holding (Luxembourg), S.A. (Petition of Bank of New York)*, 980 F.Supp. 522 (D.D.C. 1997) (same); *U.S. v. BCCI Holdings (Luxembourg) S.A. (Mistaken Wire Transfer Petitioners)*, 1994 WL 914460 *5 (D.D.C.1994) (same; transfer to defendant's account occurred *before* account was restrained).

26. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of BCCI Campaign Committee)*, 980 F.Supp. 16 (D.D.C.1997) (fraud victims— employees claiming defendant misappropriated their pension fund—lack standing to contest forfeiture of defendant's assets); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Central Bank of Peru)*, 814 F.Supp. 111 (D.D.C.1993) (victim of tortious interference with honest services of employees bribed by the defendant may not use the ancillary proceeding to recover damages); *United State v. BCCI Holdings (Luxembourg), S.A. (Petition of Republic of Panama)*, 833 F.Supp. 29 (D.D.C. 1993) (victim of embezzlement may not recover in ancillary proceeding unless it can trace its property to forfeited funds, in which case he will prevail because, unlike a fraud victim, an embezzlement victim does not part with his property voluntarily).

A last standing issue involved banks that had exercised, or attempted to exercise, a right of set-off against BCCI's accounts to recover funds BCCI owed to them. In two cases, the Court held that the right of set-off, which exists as a legal right under state banking law, is an inchoate right, and thus conveys no interest in the depositor's property, until it is exercised. Thus, a bank that held BCCI funds on deposit but had not exercised its inchoate right of set-off against the deposited funds, lacked any legal interest in specific assets that were forfeited and did not have standing to contest the forfeiture. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Capital Bank)*, 980 F.Supp. 10 (D.D.C.1997). But a bank that had actually exercised the right of set-off, and had deducted money from BCCI's account before the account was seized by the Government, did have standing to contest the forfeiture. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of American Express Bank I)*, 941 F.Supp. 180 (D.D.C.1996).

### B. Grounds on which relief can be granted under § 1963(1)(6)

#### 1. Interests that existed at the time the crime occurred

The only grounds on which a third party can prevail in the ancillary proceeding are those set forth in Sections 1963(1)(6)(A) and (B). That is, the claimant must establish either that he had a superior right, title or interest in the property at the time the crime occurred, or that he acquired the property as a *bona fide* purchaser for value without cause to know that the property was subject to forfeiture. If the claimant fails to establish facts supporting his claim under one or the other of these theories, he is not entitled to any relief in the ancillary proceeding. *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Capital Bank)*, 980 F.Supp. 10 (D.D.C. 1997). It is not enough for the claimant to establish standing. A person may be the *present* owner of the property yet fail to establish a claim under either Section 1963(1)(6)(A) or (B) because she did not have superior title *at the time the crime*

*occurred,* and did not subsequently acquire it as a *bona fide* purchaser for value. Thus, in *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of American Express Bank II)*, 961 F.Supp. 287 (D.D.C. 1997), a bank that exercised its right of set-off against BCCI's bank account had standing to contest the forfeiture as an owner of the property but could not prevail under § 1963(1)(6)(A) because it did not exercise the set-off until after the property became subject to forfeiture.

The temporal requirement that the third party's legal interest exist *at the time the crime occurred* reflects the relation-back doctrine, codified at § 1963(c). Under that provision, the Government's interest in the forfeited property dates back to the time the crime occurred, and any subsequent transfers of the property between the defendant and third parties are void. *See* § 1963(c). To give force and effect to that concept, § 1963(1)(6)(A) bars a third party who did not acquire an interest in the property until after the crime occurred from recovering in the ancillary proceeding. Such a person must recover, if at all, under the *bona fide* purchaser provision, § 1963(1)(6)(B). *See U.S. v. BCCI Holdings (Luxembourg), S.A. (Petitions of People's Republic of Bangladesh and Bangladesh Bank)*, 977 F.Supp. 1 (D.D.C.1997) (holder of an option to buy defendant's property has no legal interest until the option is exercised, and therefore cannot recover under § 1963(1)(6)(A)); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Amjad Awan)*, 3 F.Supp.2d 31 (D.D.C.1998) (person who obtains loan from defendant's bank account, after defendant engaged in racketeering activity subjecting all of defendant's assets to forfeiture, could not state a claim under (1)(6)(A), but could state a claim under (1)(6)(B)).

In *American Express Bank II,* the claimant argued that the Supreme Court's decision in *U.S. v. Parcel of Land (92 Buena Vista)*, 507 U.S. 111, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993), overruled the tem-

poral requirement in § 1963(1)(6)(A). This Court rejected that position. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of American Express Bank II)*, 961 F.Supp. 287 (D.D.C.1997).

### 2. Constructive trusts

■ The temporal requirement in § 1963(1)(6)(A) also was implicated in several cases in which claimants argued they had a legal interest in the forfeited property because they should be considered the beneficiaries of a constructive trust. Their theory was that because the defendants had induced the claimants to part with their property under false pretenses, *i.e.* fraud, the court should impose a constructive trust and recognize the claimants' interests under § 1963(1)(6)(A). However, a person who voluntarily transfers his interest to a defendant becomes an unsecured creditor who lacks standing to contest a forfeiture in the ancillary proceeding. The constructive trust theory conflicted with the standing requirement.

The Court held that no constructive trusts would be imposed in this case because, as a matter of state law, none of the claimants satisfied one of the essential requirements. That is, none could establish that the imposition of a constructive trust for the benefit of one claimant would not result in an injustice to other BCCI victims who were similarly situated. *See U.S v. BCCI Holdings (Luxembourg) S.A.*, 833 F.Supp. 9, 14 (D.D.C.1993), *aff'd*, 46 F.3d 1185 (D.D.C.Cir.1995). A constructive trust is an equitable remedy. For that reason, a court should not impose a constructive trust, even if all of the other elements are satisfied, if to do so would disrupt liquidation proceedings designed to distribute forfeited property equitably, and provide an advantage to some victims at the expense of others. Here, because the forfeited funds are being distributed through the worldwide liquidation proceeding to the BCCI victims on a *pro rata* basis, the imposition of a constructive trust in favor of a minority of victims—*i.e.*, those who could trace their property to the defendant's assets and could otherwise satisfy

the elements of a constructive trust under state law—would disadvantage other similarly situated victims by reducing the amount of funds available for disbursement to them.

On appeal from one of the decisions in this case on the constructive trust issue, the Court of Appeals held that the constructive trust argument should be rejected on another ground. Because the interest created by a constructive trust does not come into existence until a court, in the exercise of its discretion, declares that a trust will be imposed, the beneficiary of the trust does not acquire an interest in the defendant's property until that time. The beneficiary cannot prevail under § 1963(1)(6)(A) because he cannot satisfy the temporal requirement that his interest have been in existence at the time the crime occurred. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of Chawla)*, 46 F.3d 1185 (D.C.Cir.1995).

### 3. Bona fide purchasers

The second ground for recovery in the ancillary proceeding protects persons who acquired their interest *after* the offense giving rise to the forfeiture occurred, and who therefore cannot recover under § 1963(1)(6)(A). Again, the statute provides a procedural complement to the relation-back provision in § 1963(c).

Under § 1963(c), transfers of property from the defendant to third parties that occur after the property becomes subject to forfeiture are void, unless the transferee is a *bona fide* purchaser for value who is without reason to know that the property was subject to forfeiture. Accordingly, § 1963(1)(6)(B) allows *bona fide* purchasers to assert a claim in the ancillary proceeding.

The claimant must be a purchaser, meaning the claimant gave something of value, and received property in return. Creditors and victims are not "purchasers" because they did not acquire an interest in the defendant's property, they acquired only a contractual debt. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of*

*Chawla)*, 46 F.3d 1185 (D.C.Cir.1995); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of American Express Bank II)*, 961 F.Supp. 287 (D.D.C.1997) (trade creditor is not a bona fide purchaser); *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petitions of Trade Creditors)*, 833 F.Supp. 22, 28 (D.D.C.1993) (same).

■ A creditor who attempts to satisfy the debt by obtaining a judgment lien, or exercising a right of set-off, against specific property is not a bona fide purchaser of that property because he has given nothing of value in exchange for the property interest. This is so irrespective of how the antecedent debt came into existence.[27]

Finally, in addition to being a bona fide purchaser, the claimant must be reasonably without cause to believe property was subject to forfeiture. If the claimant knows that the property was involved in criminal activity, his claim under paragraph (B) will fail, even if he acquired tangible property in exchange for something of value. In this case, the Court held that with the extensive public record of BCCI's misconduct, a claimant as sophisticated as American Express Bank knew or should have known that the defendants' assets were subject to forfeiture, and so could not prevail on its § 1963(1)(6)(B) claim when it exercised a right of setoff against BCCI's property after BCCI was shut down by the worldwide bank regulators. The standard, the Court held, is one of objective reasonableness. *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of American Express Bank II)*, 961 F.Supp. 287 (D.D.C. 1997).

## CONCLUSION

The collapse of BCCI was a tragedy for the innocent depositors and creditors of BCCI, the thousands of employees of First American Corporation who were put out of work, and numerous others. While the harms caused by the unprecedented fraud are unlikely to be fully remedied, the diligence and dedication of those charged with the task of picking up the pieces have produced results far, far surpassing the dire predictions made in 1991. In particular, the parties have praised, and the Court endorses this enthusiastically, the following individuals: Attorney General William Barr and Attorney General Janet Reno for their respective exercises of discretion to remit funds to the BCCI victims, District Attorney of New York County Robert Morgenthau for his vigorous pursuit of this and related cases, George Terwilliger, Ira Raphaelson, Laurence Urgenson, G. Allen Carver, Lee Radek, Gerald Stern, Dwight Bostwick and Pamela Dempsey of the United States Department of Justice, with special mention for Stefan Cassella—the Department's forfeiture point person in this case; Richard Small, Thomas Baxter, and Virgil Mattingly on behalf of the Board of Governors of the Federal Reserve System, as well as John Moscow, Marc Scholl of the New York County District Attorney's Office.

In relation to the First American Trust, and in addition to the wise, heroic, and innovative efforts of Mr. Albright, recognition must go to the First American Board of Directors, under the wise leadership of the Honorable Charles McC. Mathias, Chairman of the Board and former U.S. Representative and U.S. Senator from the State of Maryland, Paul G. Adams III, former President and CEO of FAB, Jack Beddow, the Honorable John Doar, former counsel to the House Judiciary Committee on Watergate and Senior Partner of Doar,

---

**27.** *U.S. v. BCCI Holdings (Luxembourg), S.A. (Petition of American Express Bank II)*, 961 F.Supp. 287 (D.D.C.1997) (bank's exercise of set-off against defendant's account not a "purchase" even though bank was attempting to satisfy debt incurred when it sold property to defendant as part of a foreign exchange transaction); *U.S. v. BCCI Holding (Luxembourg), S.A. (Petition of Capital Bank)*, 980 F.Supp. 10 (D.D.C.1997) (same); *U.S. v. BCCI Holdings (Luxembourg) S.A. (Petition of Security Pacific International Bank)*, (D.D.C. Jan. 17, 1997) (unpub.) (subsection (*l*)(6)(B) applies to purchases of property and inchoate right of set-off is not a purchase of property).

Devorkin & Rieck (New York), Sister Brigid Driscoll, President Marymount College Tarrytown (ret'd), and Clifford A. Miller, Executive Vice President, Shamrock Holdings Inc. The First American Trustee also relied on Merrikay Hall, partner of Hughes Hubbard & Reed (New York), as First American's general counsel, and First American's litigation counsel, Stephen J. Brogan and Mary Ellen Powers of Jones, Day, Reavis & Pogue (Washington). In addition to those previously mentioned, Sidney A. Bailey, Commissioner of Financial Institutions in Virginia, Derrick D. Cephas, Superintendent of Banks in New York, and the Honorable Eddie George, Governor of the Bank of England. In addition, the Trustee's staff and advisors, Sol Neil Corbin, Senior Counsel of Corbin Silverman & Sanseverino LLP (New York), Frederick C. Chen, retired senior banking partner KPMG, Karie Parker Davidson and Kathy McFarland, and Barbara Greer all worked tirelessly on this matter.

With respect to the State Liquidation Trust, the Court again thanks Robb Evans, and his counsel, Frederick D. Holden, Jr. for their remarkable service.

The Court Appointed Fiduciaries are too numerous to name, but their foresight in entering into the Plea Agreement, and their efforts on behalf of the victims in this case and beyond have been truly inspirational. United States counsel for the Court Appointed Fiduciaries, Michael Nussbaum, Eric Lewis, Katherine Toomey, Stacy Feuer, as well as Jeffrey Robinson and James Davenport, deserve enormous credit for their sophisticated approach to this matter, which is substantially responsible for significant returns to the BCCI victims.

Because so many individuals contributed their talents to the resolution of this matter, it is possible, perhaps likely, that some have been overlooked. If that has been done, it has been done inadvertently. Finally, four of this Court's law clerks who were assigned to this case during its eight-year pendency deserve special thanks from the Court for their remarkable and inspiring contributions; they are: Frank E. Kulbaski, Michael J. Francese, Mark J. Yost, and Michael W. Carroll.

Having acknowledged the efforts of so many, it is time to recognize that this case has run its course. Along the way a number of hard decisions had to be made, compromises struck, and interests balanced, but the recovery of $1.2 billion for the benefit of the BCCI victims is a significant triumph.

### ORDER

On July 2, 1999, this Court entered the Final Order of Forfeiture in this case. An Opinion of the same date accompanied that Order. The Court did not have the benefit of the submission of the Court's Trustee, Robb Evans at the time the Opinion was written. Having now received that submission, the Court finds that certain amendments to the July 2, 1999 Opinion are in order. Accordingly, it is hereby

**ORDERED** that the amended Opinion, dated July 12, 1999 and attached hereto, shall replace and supersede the Opinion of July 2, 1999. This action in no way affects the Final Order of Forfeiture.

IT IS SO ORDERED.